1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    Lailaa Iqbal, et al.,                        No. 2:23-cv-01299-KJM-CSK

12                     Plaintiffs,                  ORDER

13            v.

14    Antony J. Blinken, et al.,

15                     Defendants.

16

17          This action challenges the delayed adjudication of immigrant visa applications.  The

18    parties voluntarily dismissed four of the six plaintiffs after two of the noncitizen beneficiary

19    plaintiffs received their visas.  *See* First Stip. Dismissal, ECF No. 31 (dismissing plaintiffs Lailaa

20    Iqbal and Qaiser Javed); Second Stip. Dismissal, ECF No. 36 (dismissing plaintiffs Obaid

21    Rehman and Sabah Jabeen).  The remaining plaintiffs are Muhammad Hassan and Irsa Jamil.

22    Defendants move for summary judgment and have filed a request for judicial notice.  Plaintiffs

23    have separately moved to compel the full administrative record and to strike defendants' request

24    for judicial notice.  The court **denies** the motion for summary judgment, **grants in part** the

25    motion to strike and **denies** the motion to compel.  The court first resolves the request for judicial

26    notice and motion to strike.

1

I.    **REQUEST FOR JUDICIAL NOTICE AND MOTION TO STRIKE**

According to the parties, on January 29, 2024, after defendants moved for summary judgment, a consular officer at the U.S. Embassy in Islamabad, Pakistan interviewed Ms. Jamil. *See* Second Stip. & Order for Extension of Time, ECF No. 34.  The officer refused Ms. Jamil's visa application for administrative processing. *Id.*  Defendants request the court take judicial notice of the following: "(1) that Plaintiff Jamil appeared for a consular interview and applied for an immigrant visa at the U.S. Embassy in Islamabad, Pakistan on January 29, 2024, and (2) that, following the interview, a consular officer refused her visa application under § 221(g) for administrative processing, to conduct additional security screening."  Req. Judicial Notice at 2, ECF No. 41 (citing Linda Neilan Dus Decl. ¶¶ 7–8, ECF No. 41-1).[1]  The declaration they attach is signed by Ms. Dus, a U.S. Department of State attorney adviser employed in the Advisory Opinions Division, Office of Legal Affairs of the Visa Office, Bureau of Consular Affairs.  *See* Dus Decl.  Ms. Dus is authorized to search the electronic Consular Consolidated Database for records of immigrant visas adjudicated at U.S. Embassies, and declares the database reflects the two facts noted above. *Id.* ¶¶ 1, 7–8.  In that same request, defendants appear to improperly supplement their motion for summary judgment without leave of court by discussing how the two new developments affect the court's analysis of the relevant factors in determining whether an agency action was unreasonably delayed.  *See* Req. Judicial Notice at 2–7.

Plaintiffs move to strike defendants' request for judicial notice.  Mot. Strike, ECF No. 42. They argue the fact Ms. Jamil attended an interview and was not yet issued a visa "is not news to the Court." *Id.* at 3.  Plaintiffs also argue the fact is not relevant and Ms. Dus's declaration in support of the request for judicial notice is extra-record evidence precluded by the Administrative Procedure Act (APA).  *See generally id.*  Defendants oppose the motion to strike, Opp'n Mot. Strike, ECF No. 45, and plaintiffs have replied, Reply Mot. Strike, ECF No. 46.

///

///

---

[1] When citing page numbers on filings, the court uses the pagination automatically generated by the CM/ECF system.

1    Neither party disputes Ms. Jamil appeared for an interview and the consular officer

2   refused her visa application for administrative processing to conduct additional security

3   screening.  *See* Second Stip. & Order for Extension of Time; *see also* Mot. Strike at 3 & n.1.  The

4   court **grants** judicial notice of these two adjudicative facts because the facts are not subject to

5   reasonable dispute and can "be accurately and readily determined from sources whose accuracy

6   cannot reasonably be questioned," i.e., agency records.  *See* Fed. R. Evid. 201(b)(2); *see, e.g.*,

7   *Dent v. Holder*, 627 F.3d 365, 371 (9th Cir. 2010) (taking judicial notice of "the existence of"

8   naturalization applications "because they are official agency records"); *Sanchez-Patron v.*

9   *Garland*, No. 21-70950, 2022 WL 2072649, at *1 (9th Cir. June 9, 2022) (unpublished) ("We

10   may take judicial notice of the agency's own records, even when those records were not part of

11   the administrative record in proceedings before the BIA.").  The court also takes judicial notice of

12   the online U.S. Department of State visa status checker, *see* Visa Status Checker,[2] that

13   corresponds to Ms. Jamil's visa case number, *see* Second Stip. & Order for Extension of Time at

14   1, and confirms a consular officer has adjudicated and refused her visa application, *see, e.g.*,

15   *Miguel v. Lynch*, 631 F. App'x 476 (9th Cir. 2016) (unpublished) (similarly taking judicial notice

16   of an online case status report) (citing *Dent*, 627 F.3d at 371)).  The status checker provides the

17   following notice:



---

[2] U.S. Department of State, Consular Electronic Application Center, *Visa Status Check*, https://ceac.state.gov/CEACStatTracker/Status.aspx?App=IV (last visited Aug. 8, 2024).

However, the court **grants plaintiffs' motion to strike in part**.  "The district court has considerable latitude in managing the parties' motion practice and enforcing local rules that place parameters on briefing."  *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1129 (9th Cir. 2002).  Neither the Local Rules nor this court's standing order permits parties to file sur-replies or to supplement their motions without prior approval from the court.  *See, e.g.*, *Hill v. England*, No. 05-869, 2005 WL 3031136, at *1 (E.D. Cal. Nov. 8, 2005).  Here, however, defendants appear to circumvent these rules by going beyond requesting the taking of judicial notice and attempting to supplement their motion for summary judgment in the guise of a request for judicial notice.  *See* Req. Judicial Notice at 2–7.  The appropriate procedure would have been to either move to supplement their motion in light of new developments in this case, or to withdraw their pending motion and file an amended motion for summary judgment.  Therefore, the court exercises its inherent power to manage its docket and strikes Section II, "These Developments Change the *TRAC* Analysis.  The Measurable Delay Now Only Stands Only at Less Than Two Months, Which Is Plainly Inadequate to Justify Judicial Intervention in Executive Branch Functions," of defendants' request for judicial notice.  Req. Judicial Notice at 2–7; *see Ready Transp., Inc. v. AAR Mfg., Inc.*, 627 F.3d 402, 404 (9th Cir. 2010) (discussing district courts' inherent power to control their dockets, including "power to strike items," and collecting authority).

## II.     BACKGROUND

### A.     Immigrant Visa Application Processing

As explained in a prior order, foreign nationals may petition for immigrant visas based on a familial relationship with a U.S. citizen.  *See* Prior Order at 2, ECF No. 18 (citing 8 U.S.C. §§ 1151(b)(2)(A)(i), 1201(a)(1)(A); 22 C.F.R. §§ 42.21, 42.42).  The court incorporates its prior discussion regarding immigration visa application processing by reference.  In relevant parts, for a family-based immigrant visa, a sponsoring U.S. citizen must first file the Form I-130, Petition for Alien Relative, with the United States Citizenship and Immigration Services (USCIS). 8 U.S.C. § 1154; 9 Foreign Affairs Manual (FAM) § 504.2-2(A)(a)(1).  Once the USCIS approves the I-130, the beneficiary may begin the visa application process by submitting a DS-260 Online Application for Immigrant Visa and Alien Registration.  *See* 9 FAM § 504.1-2.

1  After the beneficiary completes the DS-260 and submits all the necessary forms and fees to the

2  National Visa Center (NVC), the NVC determines whether an application is documentarily

3  complete.  *Id.* § 504.1-2(b)(2).

4        Once the NVC determines an application is documentarily complete and the applicable

5  consular officer completes all the "necessary clearance procedures," the applicant is considered

6  documentarily qualified.  22 C.F.R. § 40.1(h).  This means the applicant is qualified "to apply

7  formally for an immigrant visa[.]"  *Id.*  For an immigrant visa applicant, to "[m]ake or file an

8  application for a visa means" in relevant part, "personally appearing before a consular officer and

9  verifying by oath or affirmation the statements contained on . . . Form DS–260[.]"  *Id.* § 40.1(l).

10 During the interview, an applicant can formally apply for an immigrant visa by swearing to or

11 affirming the contents of the DS-260 and signing it before a consular officer.  22 C.F.R.

12 § 42.67(a).  The Immigration and Nationality Act (INA) provides "[a]ll immigrant visa

13 applications shall be reviewed and adjudicated by a consular officer."  8 U.S.C. § 1202(b).  Once

14 an application is properly completed and executed before a consular officer, the officer must

15 either issue or refuse to issue a visa.  *See* 22 C.F.R. § 42.81(a).

16       **B.**    **Undisputed Facts**

17       The following facts are undisputed unless otherwise noted.  Plaintiff Muhammad Hassan

18 filed an I-130 petition on behalf of his non-citizen beneficiary spouse, plaintiff Irsa Jamil.  Austin

19 Decl. ¶ 10, ECF No. 24-4.  USCIS approved that petition on August 9, 2021.  *Id.*  The NVC then

20 determined Ms. Jamil was documentarily qualified on May 24, 2022.  *Id.* ¶ 11.

21       On June 30, 2023, plaintiffs filed a complaint against defendants Antony J. Blinken, sued

22 in his official capacity as the United States Secretary of State, Rena Bitter, sued in her official

23 capacity as the Assistant Secretary of State for Consular Affairs, Michael Solberg, sued in his

24 official capacity as the Consul General for the United States Embassy in Islamabad,[3] and Andrew

25 Schofer, sued in his official capacity as the Deputy Chief of Mission for the United States

---

[3] Plaintiffs have substituted Pamela Bentley, in her official capacity as the Consul General or Consular Chief for the U.S. Embassy in Islamabad, as a party defendant for the former Consul General or Consular Chief for the U.S. Embassy in Islamabad and previously named defendant Michael Solberg in accordance with Federal Rule of Civil Procedure 25(d).  *See* ECF No. 25.

Embassy in Islamabad.  Compl. ¶¶ 19–22.  The court dismissed plaintiffs' first, second and third claims, which challenged three State Department decisions, but denied defendants' motion to dismiss as to claim four, which alleges unreasonable delay in violation of 5 U.S.C. § 555(b), and claim five, which requests relief under the Mandamus Act, 28 U.S.C. § 1361.  *See* Prior Order. The court found the reasonableness inquiry was best resolved ultimately on a full factual record. *Id.* at 13.

Defendants now move for summary judgment on claims four and five.  Mot. Summ. J. (MSJ), ECF No. 24.  In support, they have provided the following undisputed facts.

In the 2018 and 2019 fiscal year, consular officers at the U.S. Embassy in Islamabad adjudicated 13,974 and 12,896 immigrant visa applications, respectively.  Grewe Decl. ¶ 3, ECF No. 24-3.  However, consular officers adjudicated 7,332 immigration visa applications in the 2020 fiscal year, and 8,183 immigrant visa applications in the 2021 fiscal year.  *Id.*  The number of visa applications adjudicated has steadily increased since then—consular officers adjudicated 10,838 immigrant visa applications in the 2022 fiscal year and 16,227 immigrant visa applications in the 2023 fiscal year.  *Id.*  Nonetheless, the immigrant visa backlog has increased from 658 documentarily complete immediate relative applications on March 1, 2020, to 12,097 on December 7, 2023.  *See* Austin Decl. ¶ 3.

The decrease in immigrant visa applications adjudicated in the 2020 and 2021 fiscal years was due in part to the COVID-19 pandemic.  Grewe Decl. ¶ 3.  For example, "[i]n March 2020, the Office of Management and Budget ('OBM') directed all federal agencies, including the Department [of State], to utilize the full scope of their legal authority to minimize face-to-face interactions due to the COVID-19 pandemic."  Bentley Decl. ¶ 11, ECF No. 24-2.  In response, on March 20, 2020, the State Department "suspended all routine visa services" at all U.S. embassies and consulates, including immigrant visa interviews, and cancelled interviews already scheduled.  *Id.*  The U.S. Embassy in Islamabad resumed limited scheduling of immediate relative visas in June 2020, and resumed all routine visa services in March 2021.  *Id.* ¶ 13.

The Consular Section at the U.S. Embassy in Islamabad also "played a major role in assisting evacuees out of Afghanistan after the fall of Kabul in August 2021."  *Id.* ¶ 14.  Between

1    August and October 2021, the embassy "processed thousands of U.S. citizens, U.S. lawful

2    permanent residents, locally employed staff from U.S. Embassy Kabul, and other U.S.

3    government-affiliated noncitizens for onward travel to the United States through various legal

4    pathways, including hundreds of [immigrant visas] and Special Immigrant Visa ('SIV')

5    applications for Afghan nationals." *Id.*

6        Since "the onset of the COVID-19 pandemic through 2023," the U.S. Embassy in

7    Islamabad has had several staff vacancies, including three vacant positions for U.S. direct-hire

8    employees, who perform various duties including "case processing and adjudication" and "in

9    person interviews." *Id.* ¶¶ 16–17.  Two temporary interpreter positions also are vacant. *Id.* ¶ 17.

10    To assist the embassy, the State Department has assigned four additional consular officers on

11    temporary details in Islamabad; however, those details "last, on average, thirty days." *Id.*  The

12    staffing vacancies "are partially explained by the fact that Islamabad is considered a hardship and

13    high-threat post," many of the positions require adjudicators to know or learn Urdu or Dari, and

14    the "pandemic resulted in a drastic drop in fee revenue for the [State] Department and visa

15    services are primarily fee funded." *Id.* ¶ 16.

16        After defendants filed their motion for summary judgment, Ms. Jamil "appeared for a

17    consular interview and applied for an immigrant visa at the U.S. Embassy in Islamabad, Pakistan"

18    on January 29, 2024.  Dus Decl. ¶ 7; *see also* Second Stip. & Order for Extension of Time.  A

19    consular officer refused to issue a visa that same day "under Section 221(g) of the INA for

20    required administrative processing to conduct additional security screening."  Dus Decl. ¶ 8.

21        While Ms. Jamil was waiting for her scheduled interview to take place, the court granted

22    plaintiffs two extensions of time to respond to the motion for summary judgment.  First Stip. &

23    Order for Extension of Time, ECF No. 28; Second Stip. & Order for Extension of Time.

24    Plaintiffs have now filed an opposition, Opp'n, ECF No. 43, and defendants have replied, Reply,

25    ECF No. 47.  The court held a hearing on the pending matters on May 17, 2024.  Mins. Mot.

26    Hr'g, ECF No. 52.  Curtis Morrison appeared for plaintiffs.  *Id.*  Elliot Wong appeared for

27    defendants.  *Id.*

### III.   SUBJECT MATTER JURISDICTION

"If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).  The court lacks subject matter jurisdiction when the controversy before it becomes moot.  *In re Burrell*, 415 F.3d 994, 998 (9th Cir. 2005).  "A case is moot if the issues presented are no longer live and there fails to be a 'case or controversy' under Article III of the Constitution." *Id.* (citing *GTE Cal., Inc. v. FCC*, 39 F.3d 940, 945 (9th Cir. 1994)).  "The basic question in determining mootness is whether there is a present controversy as to which effective relief can be granted." *Nw. Env't Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988) (citing *United States v. Geophysical Corp.*, 732 F.2d 693, 698 (9th Cir. 1984)).

As noted, Ms. Jamil appeared for an interview in the U.S. Embassy in Islamabad and a consular officer refused her visa application for administrative processing to conduct additional security screening.  *See* Second Stip. & Order for Extension of Time.  The parties dispute whether the consular officer's decision to refuse Ms. Jamil's visa application renders plaintiffs' claims moot.  *See* Mot. Compel at 7, ECF No. 37; Req. Judicial Notice at 2 n.1; Opp'n at 28 n.20; Joint Status Report at 2, ECF No. 50.  The parties, however, do not provide any analysis in their briefings regarding this issue.  The court directed the parties to come prepared to discuss whether plaintiffs' claims are moot at the May 17, 2024, hearing.  *See* Min. Order, ECF No. 49.  During hearing, the court confirmed neither party requested supplemental briefing on this issue.

Courts have found immigration cases moot when a consular officer makes a final decision to grant or deny an applicant's visa application.  *See, e.g.*, *OC Modeling, LLC v. Michael Richard Pompeo*, No. 20-1687, 2020 WL 7263278, at *3 (C.D. Cal. Oct. 7, 2020) (collecting cases).  However, many district courts have found "the 'administrative processing' designation insufficient to constitute a refusal."  *Mohamed v. Pompeo*, No. 19-01345, 2019 WL 4734927, at *4 (E.D. Cal. Sept. 27, 2019).[4]  These courts have considered the contents of the refusal letters,

---

[4] *See, e.g.*, *Rasoulzadeh v. Tillerson*, No. 17-2399, 2018 WL 1426965, at *2 (S.D. Cal. Mar. 22, 2018) (denying motion to dismiss complaint as moot because "there is a dispute of fact as to whether [the] visa application has been denied or whether it is still undergoing administrative processing"); *Billoo v. Baran*, No. 21-05401, 2022 WL 1841611, at *4 (C.D. Cal.

1    and other factors to find that although consular officials "nominally" refused the visa application,

2    by determining the visa application required further administrative processing, the visa

3    application remained under consideration and could not "fairly be described as a final

4    determination." *Sharifi v. Blinken*, No. 23-5112, 2024 WL 1798185, at *3 (E.D.N.Y. Apr. 25,

5    2024).

6           Other courts, however, have found visa refusals moot claims alleging unreasonable delay

7    and requests for mandamus relief, even if the visa application has been placed in administrative

8    processing to conduct additional security screening. *See Bamdad v. U.S. Dep't of State*,

9    No. 23-757, 2024 WL 1462948, at *3 (W.D. Tex. Feb. 9, 2024).[5]  These courts rely on the

10   language of the applicable federal regulations and sections of the INA to conclude claims become

11   moot when a consular officer refuses a visa application. *Id.*

12          "When a visa application has been properly completed and executed before a consular

13   officer . . . , the consular officer must issue the visa, refuse the visa under INA 212(a) or 221(g) or

14   other applicable law or, pursuant to an outstanding order under INA 243(d), discontinue granting

15   the visa." 22 C.F.R. § 42.81(a). "If a visa is refused, and the applicant within one year from the

---

Mar. 18, 2022) (not moot because while application was labelled "refused," application was still in administrative processing and consular officer requested more information); *Gonzalez v. Baran*, No. 21-05902, 2022 WL 1843148, at *3 (C.D. Cal. Jan. 11, 2022) (collecting authority); *Taherian v. Blinken*, No. 23-01927, 2024 WL 1652625, at *3 (C.D. Cal. Jan. 16, 2024) (same); *Shahjani v. Laitinen*, No. 23-03967, 2023 WL 6889774, at *3 (C.D. Cal. Oct. 6, 2023) (same); *Nine Iraqi Allies Under Serious Threat Because of Their Faithful Serv. to the United States v. Kerry*, 168 F. Supp. 3d 268, 285–89 (D.D.C. 2016) (considering specificities of refusal letter and website information regarding definition of "administrative processing"); *Ibrahim v. U.S. Dep't of State*, No. 19-610, 2020 WL 1703892, at *5 (D.D.C. Apr. 8, 2020) (collecting authority across the country); *cf. Patel v. Reno*, 134 F.3d 929, 932 (9th Cir. 1997) (no refusal when letter did not comply with refusal procedure under 22 C.F.R. § 42.8(b)); *Amerkhail v. Blinken*, No. 22-00149, 2022 WL 4093932, at *5 (E.D. Mo. Sept. 7, 2022) (not moot because plaintiff alleged defendants unreasonably delayed completing "administrative processing" step).

     [5] *See, e.g., Elhabash v. U.S. Dep't of State*, No. 09-5847, 2010 WL 1742116, at *3 (D.N.J. Apr. 27, 2010) (case moot when Embassy refused visa); *Ahmed v. Miller*, No. 19-11138, 2020 WL 3250214, at *2, 7 (E.D. Mich. June 16, 2020), *aff'd sub nom. Baaghil v. Miller*, 1 F.4th 427 (6th Cir. 2021) (claims moot when visa refused but file placed in administrative proceeding); *Conley v. U.S. Dep't of State*, No. 24-10131, 2024 WL 1640074, at *4 (D. Mass. Apr. 16, 2024) (noting split and finding claim for unreasonable delay moot once consular officer refused visa application).

1   date of refusal adduces further evidence tending to overcome the ground of ineligibility on which

2   the refusal was based, the case shall be reconsidered." *Id.* § 42.81(e).  Section 221(g) of the INA

3   provides several grounds for non-issuance of visas.  *See* 8 U.S.C. § 1201(g).

4       Here, the consular officer refused Ms. Jamil's visa application under section 221(g) for

5   administrative processing to conduct additional security screening.  The INA and related

6   regulations do not provide for this "administrative processing" designation, which has the effect

7   of placing Ms. Jamil's application in limbo—her visa application was neither granted nor refused

8   in such a way that she now has an opportunity to request reconsideration of the refusal under

9   22 C.F.R. § 42.81.  Defendants confirmed at hearing that when a visa is refused for the purpose of

10  administrative processing, defendants are not waiting for the applicant to provide additional

11  evidence.  Rather, the government is undergoing a security vetting process on its own without

12  additional input from the applicant.

13      According to a declaration by Carson Wu, the Acting Director of the Bureau of Consular

14  Affairs' Office of Screening, Analysis and Coordination (SAC), the SAC has the "primary

15  responsibility for screening noncitizens who apply for U.S. visas for potential security-related

16  grounds of visa ineligibility."  Second Wu Decl. ¶¶ 1–2, ECF No. 43-1.  Although the defendants

17  in a separate case filed the original declaration, defendants in this case do not challenge the

18  court's consideration of the declaration here.  *See* Reply at 11.  At hearing, defendants agreed the

19  court could consider the declaration with respect to the question of mootness.  Mr. Wu signed the

20  declaration under penalty of perjury, *see* Second Wu Decl., and the court considers it to determine

21  whether the case is now moot, *see Fed. Deposit Ins. Corp. v. N.H. Ins. Co.*, 953 F.2d 478, 485

22  (9th Cir. 1991) ("[T]he nonmoving party need not produce evidence 'in a form that would be

23  admissible at trial in order to avoid summary judgment.'" (citation omitted)).

24      According to Mr. Wu's declaration, the SAC coordinates with several other bureaus

25  within the State Department, law enforcement and intelligence agencies, and other "U.S.

26  government partners on matters involving national security, technology transfer,

27  counterintelligence, human rights violations, and U.S. sanctions."  *Id.* ¶ 2.  "After coordinating

28  with these other interested agencies, SAC analysts provide consular officers with Security

1  Advisory Opinions (SAO) responses related to grounds of visa ineligibility and inadmissibility

2  under section 212(a)(3) of the Immigration and Nationality Act (INA)." *Id.* "In any case where

3  an officer uncovers facts that would require additional security vetting, the officer is required to

4  submit an SAO to initiate additional security vetting." *Id.* ¶ 18. "In any case in which a SAO is

5  required, a consular officer must wait for a response, which will provide a recommendation on

6  whether sufficient information exists to support a security-related ineligibility finding." *Id.* ¶ 19.

7  The timing and completion of SAO responses depend on a variety of factors including "extent of

8  review and coordination required," "amount of derogatory information," "which other agencies

9  have responsive information," "timing of when each partner agency completes its review,"

10 "emergent circumstances such as COVID," "SAO request volume," and "foreign policy

11 priorities." *Id.* ¶ 27. "Because of the complexity of this process, SAO requests can be neither

12 addressed nor resolved in a first-in-first-out basis." *Id.* In general, however, in 75 percent of

13 cases requiring additional security vetting, security vetting is concluded in approximately 120

14 days. *Id.*

15        Although the consular officer nominally refused Ms. Jamil's application, it appears the

16 consular officer is waiting for the SAC to complete the additional security vetting. In fact, the

17 Foreign Affairs Manual designates cases like Ms. Jamil's "Quasi-Refusal Cases" as opposed to

18 regular "Refusal Cases." *Compare* 9 FAM § 504.11-3(B) ("Quasi-Refusal Cases," which include

19 circumstances that do not constitute a "formal refusal"), *with id.* § 504.11-3(A) ("Refusal Cases").

20 The Foreign Affairs Manual provides in cases requiring an advisory opinion (AO), "[u]nder no

21 circumstances should a decision on the question of eligibility be made before the Department's

22 AO is received." *Id.* § 504.11-3(B)(2)(a).[6]

23        Moreover, the court lacks information needed to confirm whether the refusal of

24 Ms. Jamil's application complies with 22 C.F.R. § 42.81(b) ("Procedure in refusing immigrant

25 visas."). Neither party provided the court with a copy of a refusal letter or form provided to

26 Ms. Jamil when her application was refused for administrative processing. *See, e.g.*, *Patel*,

---

[6] It appears the AO referenced in the Foreign Affairs Manual is equivalent to the SAO referenced in Mr. Wu's declaration—both refer to an "advisory opinion."

1    134 F.3d at 932 (refusal letter did not comply with the regulations and was not a "final

2    decision").  Here, it appears defendants are holding Ms. Jamil's visa application "in abeyance."

3    *See id.*  Therefore, the court joins with the courts that have found the refusal of a visa application

4    for administrative processing does not constitute a final decision.  Because there has been no

5    final adjudication of Ms. Jamil's visa application, plaintiffs' claims are not moot.

6    **IV.   MOTION TO COMPEL ADMINISTRATIVE RECORD**

7           Plaintiffs move to compel the full administrative record.  Mot. Compel.  Defendants

8    oppose, Mot. Compel Opp'n, ECF No. 39, and plaintiffs have not filed a reply.  The court **denies**

9    the motion because plaintiffs are not challenging a final agency action.

10          Plaintiffs' motion "reflects confusion between lawsuits that challenge the propriety of a

11   final agency action, and suits that are brought to compel an agency to act in the first instance."

12   *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000).  Plaintiffs' sole

13   remaining claims allege unreasonable delay of an agency action, that is, defendants have

14   unreasonably delayed adjudicating Ms. Jamil's visa application.  *See generally* Prior Order

15   (dismissing plaintiffs' first, second and third claims but denying defendants' motion to dismiss as

16   to claims four (unreasonable delay in violation of 5 U.S.C. § 555(b)) and five (relief under the

17   Mandamus Act, 28 U.S.C. § 1361)).

18          Plaintiffs' remaining claims do not challenge a final agency action; rather they argue

19   agency action has been unreasonably delayed.  Therefore, "review is not limited to the record as it

20   existed at any single point in time, because there is no final agency action to demarcate the limits

21   of the record."  *Friends of the Clearwater*, 222 F.3d at 560.

22   **V.   MOTION FOR SUMMARY JUDGMENT**

23          **A.   Legal Standard**

24          A court may grant summary judgment if there is "no genuine dispute as to any material

25   fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The

26   "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved

27   only by a finder of fact because they may reasonably be resolved in favor of either party."

28   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  In deciding a motion for summary

judgment, the court draws all inferences and views all evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

The party moving for summary judgment bears the initial burden of production. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If, as in this case, the moving party does not have the ultimate burden of persuasion at trial, it must carry its initial burden of production at summary judgment in one of two ways: "either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102. "If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Id.* at 1102–03. If, however, the moving party does carry its initial burden of production, the nonmoving party must produce evidence to support its claims and "establish that there is a genuine issue of material fact." *Matsushita*, 475 U.S. at 585.

**B.      Discussion**

Under the APA, the reviewing court must "compel agency action . . . unreasonably delayed[.]" 5 U.S.C. § 706(1). However, "[a] court can compel agency action under this section only if there is a specific, unequivocal command placed on the agency to take a discrete agency action, and the agency has failed to take that action." *Vietnam Veterans of Am. v. Cent. Intel. Agency*, 811 F.3d 1068, 1075 (9th Cir. 2016) (internal marks and citation omitted). Similarly, the Mandamus Act "provides district courts with mandamus power 'to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.'" *Indep. Min. Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997) (quoting 28 U.S.C. § 1361). "Although the exact interplay between these two statutory schemes has not been thoroughly examined by the courts, the Supreme Court has construed a claim seeking mandamus under the [Mandamus Act] 'in essence,' as one for relief under § 706 of the APA." *Id.* (quoting *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 n.4 (1986)). "Because the relief sought is essentially the

1    same, in the form of mandamus," the court analyzes plaintiffs' entitlement to relief under the

2    APA. *Id.*

3           In its prior order, the court found defendants have a nondiscretionary duty to adjudicate

4    Ms. Jamil's immigrant visa petition within a reasonable time. *See* Prior Order at 11–12. The

5    court declines to revisit that conclusion.

6           The court now considers whether defendants have shown they are entitled to judgment as

7    a matter of law with regards to plaintiffs' unreasonable delay claim. In determining whether an

8    agency action was unreasonably delayed, the courts consider the six "*TRAC* factors." *In re Nat.*

9    *Res. Def. Council, Inc.*, 956 F.3d 1134, 1138 (9th Cir. 2020).

10          The factors are:

11                  (1) the time agencies take to make decisions must be governed by a
12                  rule of reason; (2) where Congress has provided a timetable or other
13                  indication of the speed with which it expects the agency to proceed
14                  in the enabling statute, that statutory scheme may supply content for
15                  this rule of reason; (3) delays that might be reasonable in the sphere
16                  of economic regulation are less tolerable when human health and
17                  welfare are at stake; (4) the court should consider the effect of
18                  expediting delayed action on agency activities of a higher or
19                  competing priority; (5) the court should also take into account the
20                  nature and extent of the interests prejudiced by delay; and (6) the
21                  court need not find any impropriety lurking behind agency lassitude
22                  in order to hold that agency action is unreasonably delayed.

23   *Id.* at 1138–39 (quoting *Telecommc'ns Rsch. & Action Ctr. v. F.C.C.*, 750 F.2d 70, 79–80 (D.C.

24   Cir. 1984)). In considering these factors, the court views the summary judgment record in the

25   light most favorable to plaintiffs and draws all reasonable inferences in their favor. *See*

26   *Matsushita*, 475 U.S. at 587–88.

27          **1.      *TRAC* Factor One: Rule of Reason**

28          Although not determinative, the first factor, "rule of reason," is the most important factor.

29   *In re A Cmty. Voice*, 878 F.3d 779, 786 (9th Cir. 2017). Courts examine the length of delay and

30   reason for the delay to determine "whether there is any rhyme or reason for the Government's

31   delay—in other words, whether the agency's response time . . . is governed by an identifiable

1    rationale." *Poursohi v. Blinken*, No. 21-01960, 2021 WL 5331446, at *4 (N.D. Cal. Nov. 16,

2    2021) (internal marks and citation omitted).

3        The undisputed facts show there is a set of identifiable rationales for the delay in this case.

4    Mr. Hassan filed an I-130 petition on behalf of his non-citizen beneficiary spouse, Ms. Jamil.

5    Austin Decl. ¶ 10.  Plaintiffs argue Mr. Hassan filed that petition on March 3, 2020.  Opp'n at

6    24.[7]  USCIS then approved Mr. Hassan's I-130 petition on August 9, 2021.  Austin Decl. ¶ 10.

7    The NVC then determined Ms. Jamil was documentarily qualified on May 24, 2022.  *Id.* ¶ 11.

8        However, on March 20, 2020, the State Department suspended all routine visa services

9    due to the COVID-19 pandemic.  *See* Bentley Decl. ¶ 11.  The U.S. Embassy in Islamabad did

10   not resume limited scheduling of immediate relative visas until June 2020, and did not fully

11   resume all routine visa services until March 2021.  *Id.* ¶ 13.

12       In August 2021, the Taliban took over Kabul, Afghanistan, and the Consular Section at

13   the U.S. Embassy in Islamabad "played a major role in assisting evacuees out of Afghanistan[.]"

14   *Id.* ¶ 14.  Between August and October 2021, the embassy "processed thousands of U.S. citizens,

15   U.S. lawful permanent residents, locally employed staff from U.S. Embassy Kabul, and other

16   U.S. government-affiliated noncitizens for onward travel to the United States through various

17   legal pathways, including hundreds of [immigrant visas] and Special Immigrant Visa ('SIV')

18   applications for Afghan nationals."  *Id.*

19       Since the onset of the COVID-19 pandemic to 2023, the U.S. Embassy in Islamabad has

20   struggled with several staff vacancies, including three vacant positions for U.S. direct-hire

21   employees, who perform various duties including "case processing and adjudication" and "in

22   person interviews."  *Id.* ¶¶ 16–17.  As noted above, the staffing vacancies "are partially explained

23   by the fact that Islamabad is considered a hardship and high-threat post," many of the positions

24   require adjudicators to know or learn Urdu or Dari, and the "pandemic resulted in a drastic drop

25   in fee revenue for the [State] Department and visa services are primarily fee funded."  *Id.* ¶ 16.

---

[7] Although plaintiffs provide no evidence to substantiate this argument, defendants do not
challenge this statement and the court has no reason to doubt it.

The COVID-19 pandemic, Taliban takeover and staffing vacancies have resulted in significant backlogs and delays. *See* Austin Decl. ¶ 3. In addition to these factors, Ms. Jamil's application is undergoing administrative processing for additional security screening. Dus Decl. ¶ 8; *see also* Second Stip. & Order for Extension of Time. The undisputed facts show an identifiable set of rationales for the delay in this case.

In addition, the length of delay does not itself indicate unreasonable delay. As a preliminary matter, the court rejects plaintiffs' suggestion that defendants have delayed adjudicating Ms. Jamil's visa since March 3, 2020. *See* Opp'n at 24. March 3, 2020, was when Mr. Hassan filed an I-130 petition, and not when Ms. Jamil submitted her DS-260 immigrant visa application. *See id.* at 15; Austin Decl. ¶¶ 10–12. The USCIS has already approved the I-130 petition, which is separate from the DS-260 application. *See, e.g.*, *Arab v. Blinken*, 600 F. Supp. 3d 59, 67 (D.D.C. 2022) (claims against Department of Homeland Security and USCIS officials moot because they had already approved the plaintiff's I-130 petition and forwarded it to NVC, thus their role in processing the visa application was complete and it was for the Department of State to schedule a consular interview and consular officer to issue or refuse the visa). At the earliest, defendants have delayed adjudicating Ms. Jamil's application since May 24, 2022, the date the NVC determined Ms. Jamil was documentarily qualified, or at the latest, January 29, 2024, the date the consular officer in the U.S. Embassy in Islamabad interviewed and refused her visa application. Defendants argue the length of delay is measured from the last government action, January 29, 2024. *See* Reply at 7 (citing *Khushnood v. U.S. Citizenship and Immigration Serv.*, No. 21-02166, 2022 WL 407152, at *4 (D.D.C. Feb. 10, 2022)). Plaintiff argues the delay should be measured from May 24, 2022, or even earlier, March 3, 2020. *See* Opp'n at 24.

The court does not resolve here whether the delay should be measured from the date the NVC determined Ms. Jamil was documentarily qualified or the date the consular officer refused her application for further administrative processing. Although the consular officer submitted her application for further administrative processing on January 29, 2024, this does not change the fact Ms. Jamil's application has been pending since May 24, 2022.

1    In any case, in the immigration context, district courts have generally found delays of less

2    than four years are not unreasonable.  *See, e.g.*, *Islam v. Heinauer*, 32 F. Supp. 3d 1063, 1071

3    (N.D. Cal. 2014) (collecting cases and noting courts in that district "have generally found delays

4    of four years or less not to be unreasonable"); *Poursohi*, 2021 WL 5331446, at *5 (collecting

5    cases and noting delay of two years "does not typically require judicial intervention"); *but cf.*

6    *Feng v. Beers*, No. 13-02396, 2014 WL 1028371, at *4 (E.D. Cal. Mar. 14, 2014) (declining to

7    decide whether delay of 16 months is unreasonable on a motion to dismiss and motion for

8    summary judgment).

9    The undisputed facts of record show defendants' response time—whether it be over two

10   years or seven months—is governed by a set of identifiable rationales in light of the backlog and

11   delays caused in part by the effects of the global pandemic, resource allocation in the Embassy in

12   Islamabad to assist with ramifications of the Taliban takeover, continuing staffing vacancies, and

13   the additional time needed to conduct additional security screening.  *See, e.g.*, *Kapoor v. Blinken*,

14   No. 21-01961, 2022 WL 181217, at *4 (N.D. Cal. Jan. 20, 2022) (delays due to COVID

15   reasonable and collecting cases); *Infracost Inc. v. Blinkon*, No. 23-2226, 2024 WL 1914368, at *8

16   (S.D. Cal. Apr. 30, 2024) (cause of delay does not appear to lack reason where defendants needed

17   additional information because of the sensitive nature of visa determination and other factors).

18   On this record, this factor weighs in favor of defendants.

19                    **2.    *TRAC* Factor Two: Timetable**

20   For the second *TRAC* factor, the court considers whether "Congress has provided a

21   timetable or other indication of the speed with which it expects the agency to proceed in the

22   enabling statute[.]"  *In re Nat. Res. Def. Council, Inc.*, 956 F.3d at 1138.  Congress has not

23   provided a timetable for processing immigration visa applications.  *Cf.* 8 U.S.C.

24   § 1158(d)(5)(A)(ii) (another provision of the INA requiring interviews to "commence not later

25   than 45 days after the date an application is filed" for asylum cases).  Rather, "Congress has given

26   the State Department and other agencies wide discretion in the area of immigration processing."

27   *Milligan v. Pompeo*, 502 F. Supp. 3d 302, 318 (D.D.C. 2020) (internal marks and citation

28   omitted).

1      Plaintiffs point to two sources to argue Congress did provide a timetable.  First, plaintiffs

2  point to 8 U.S.C. § 1571(b), which provides "[i]t is the sense of Congress that the processing of

3  an immigration benefit application should be completed not later than 180 days after the initial

4  filing of the application[.]"  8 U.S.C. § 1571(b).  However, it is unclear how § 1571 is relevant in

5  this case given the provision is directed to the USCIS regarding the processing of immigration

6  benefit applications, and not to consular officials regarding the processing of immigrant visa

7  applications.  *See, e.g.*, *El Centro Reg'l Med. Ctr. v. Blinken*, No. 21-00361, 2021 WL 3141205,

8  at *4 (S.D. Cal. July 26, 2021) ("[T]he plain text of § 1571 indicates that it applies to the

9  processing of immigrant benefit applications by USCIS, not consular officials at the State

10  Department."); *Borzouei v. Bitter*, No. 22-872, 2022 WL 17682659, at *5 (S.D. Cal. Dec. 14,

11  2022), *appeal dismissed*, No. 23-55121, 2023 WL 9546520 (9th Cir. Nov. 21, 2023) (same).

12  Moreover, as plaintiffs note, this language is "merely precatory," and does not impose a

13  mandatory timetable.  *See* Opp'n at 25; *see, e.g.*, *Eljalabi v. Blinken*, No. 21-1730,

14  2022 WL 2752613, at *5 (D.D.C. July 14, 2022).

15      Second, plaintiffs point to 9 FAM 504.7-2(b), which provides the State Department

16  "expects all IV units to strive to meet the 30[] day requirement[]" of the policy set forth in

17  Section 237 of Public Law 106-113.  Section 237(a) states "[i]t shall be the policy of the

18  Department of State to process immigrant visa applications of immediate relatives of United

19  States . . . within 30 days of the receipt of all necessary documents from the applicant and the

20  Immigration and Naturalization Service."  Consolidated Appropriations Act of 2000, Pub. L.

21  No. 106-113, § 237, 113 Stat. 1501  (1999).  Rather than being a mandatory timetable imposed

22  by Congress, the 30-day timeline is a non-binding policy the Department of State strives to meet.

23  *See, e.g.*, *Kapoor*, 2022 WL 181217, at *7; *Pourshakouri v. Pompeo*, No. 20-00402,

24  2021 WL 3552199, at *9 n.11 (D.D.C. Aug. 11, 2021) (finding 9 FAM § 504.7-2 "insufficient to

25  displace the significant discretion that Congress provided to the federal agencies tasked with

26  processing immigration applicants and vetting them to protect the national security").

27      Although there is no mandated timeline, the court notes "a non-binding deadline may still

28  be an *indication* of the speed with which Congress expects the agency to proceed."  *Ramirez v.*

18

*Blinken*, 594 F. Supp. 3d 76, 94 (D.D.C. 2022) (emphasis in original) (internal marks and citations omitted).  Thus, while the 30-day timeline may be a non-mandatory, aspirational goal, a delay of at least seven times Congress's stated goal runs counter to Congressional expectations. *Cf. e.g.*, *Keller Wurtz v. U. S. Citizenship & Immigr. Servs.*, No. 20-2163, 2020 WL 4673949, at *5 (N.D. Cal. Aug. 12, 2020) ("USCIS is correct that this timeline is not mandatory, but it nevertheless weighs in favor of finding the delay here—approximately four times Congress's stated goal—to be unreasonable."); *Islam*, 32 F. Supp. 3d at 1073 ("While the language of § 1571(b) [policy of completing certain immigration applications within 180 days] is not mandatory, it nonetheless suffices to tip the second TRAC factor i[n] [plaintiff's] favor."). However, because Congress has not yet imposed a mandatory timeline for adjudicating Ms. Jamil's application and the delay otherwise comports with the rule of reason, the second factor is neutral based on this record.  *See, e.g.*, *Poursohi*, 2021 WL 5331446, at *9 ("[T]he absence of a mandatory timetable for adjudication of Plaintiffs' Application combined with the fact that the delay comports with the rule of reason, the second TRAC factor also weighs in Defendant's favor or is at least neutral.").

### 3.    *TRAC* Factors Three and Five: Nature of Interests

"The third and fifth factors overlap, requiring the court to consider whether human health and welfare are at stake, and the nature and extent of the interests prejudiced by the delay." *Poursohi*, 2021 WL 5331446, at *9.  Defendants do not challenge plaintiffs' allegations that they have suffered significant emotional, psychological and financial hardships as a result of the prolonged and indefinite family separation caused by defendants' delay.  *See* MSJ at 17–18; Reply at 13.  The INA "was intended to keep families together."  *Solis-Espinoza v. Gonzales*, 401 F.3d 1090, 1094 (9th Cir. 2005), and the goals of the INA undoubtably are hindered by the indefinite family separation here.  It is reasonable to infer plaintiffs have suffered significant harm due to the prolonged separation and uncertainty regarding the status of Ms. Jamil's application. Because it is defendants' initial burden to show no material facts are in dispute, *see Celotex Corp.*, 477 U.S. at 325, and they have not submitted any evidence regarding factors three and

1    five, the court draws all reasonable inferences in plaintiffs' favor to conclude these factors weigh

2    in favor of plaintiffs based on the record before the court.

3                    **4.    *TRAC* Factor Four: Effect of Expediting Delayed Action**

4            For the fourth factor, the court considers "the effect of expediting delayed action on

5    agency activities of a higher or competing priority[.]" *In re Nat. Res. Def. Council, Inc.*, 956 F.3d

6    at 1141 (citation omitted).  "[W]here an agency's progress on one individual's application would

7    necessarily negatively impact another application, courts have held that plaintiffs' recourse is

8    with Congress, not the courts." *Liu v. Denayer*, No. 16-653, 2022 WL 17370527, at *5 (C.D.

9    Cal. July 18, 2022).

10           Plaintiffs request the court compel defendants to "process Plaintiffs' immigrant visa

11   applications [and] issue visas to eligible Beneficiary Plaintiffs[.]"  Compl. at 33 (Prayer for

12   Relief).  Defendants argue the relief plaintiffs seek would essentially allow plaintiffs to reorder

13   the queue and allow Ms. Jamil's application to be placed ahead of other applicants who have

14   similarly been waiting for a similar or longer period of time.  MSJ at 13–14.  The granting of

15   plaintiffs' request would require the court to "upend the State Department's discretionary

16   balancing of competing demands and its allocation of limited consular resources." *Id.* at 16.

17   Plaintiffs argue there is no queue now that Ms. Jamil's application is going through additional

18   security vetting.  *See* Opp'n at 27 (citing Second Carson Wu Decl. ¶ 27).

19           The court agrees its authority cannot be deployed as a tool to "cut in line" or reorder

20   agency priorities in plaintiffs' favor at the expense of other similarly situated applicants. *See,*

21   *e.g.*, *Ferdowski v. Blinken*, No. 23-01123, 2024 WL 685912, at *5 (C.D. Cal. Feb. 12, 2024)

22   ("Where, as here, Plaintiffs suffer general physical, financial, and emotional stresses, courts

23   consider the government's competing priorities and the fact that pushing Plaintiffs' application to

24   the front of the line would delay the applications of others, who also have human welfare and

25   interests at stake." (citation and marks omitted)).  At the same time, however, the lack of consular

26   resources and "[d]efendants' failure to fulfill their statutory duty to other applicants ha[ve] no

27   bearing on whether they have fulfilled their statutory duty to [p]laintiffs." *Liang v. Att'y Gen. of*

28   *U.S.*, No. 07-2349, 2007 WL 3225441, at *7 (N.D. Cal. Oct. 30, 2007).

1    Here, the parties agree SAO responses cannot be completed on a first-in, first-out basis.

2    *See* Opp'n at 27; Reply at 12.  Accordingly, there is no evidence adjudicating Ms. Jamil's

3    application will place her ahead of other similarly situated applicants who have been waiting the

4    same amount or longer time.  Moreover, defendants have not provided any evidence of the "line"

5    plaintiffs are supposedly cutting.  Apart from citing several cases, defendants have not produced

6    evidence of what their competing or higher priorities are.  They also have not produced evidence

7    of the effect timely adjudicating Ms. Jamil's application will have on those priorities.  The court

8    understands defendants have an important role in making sure visa applicants do not pose

9    national security risks and are working with limited consular resources.  However, these factors

10   do not excuse defendants from their duty to adjudicate plaintiffs' immigrant visa petitions within

11   a reasonable time.  The record before the court shows this factor weighs in favor of plaintiffs.

12                              **5.    *TRAC* Factor Six: Impropriety**

13   Plaintiffs do not allege or argue impropriety or bad faith.  *See generally* Opp'n.  Based on

14   this record, this factor weighs in favor of defendants.

## VI.    CONCLUSION

16   Having considered all the factors in light of the record before it, the court cannot conclude

17   defendants are entitled to summary judgment.  Without more information, the court cannot

18   determine whether the time defendants are taking to conduct the additional security screening and

19   complete adjudicating Ms. Jamil's visa application is reasonable considering her unique

20   circumstances.  Defendants have provided no estimate of the additional time they need to

21   complete adjudicating the application.  The court is concerned the "administrative processing"

22   designation is a convenient bureaucratic label allowing defendants to place visa applicants like

23   Ms. Jamil in limbo, where their visas are neither refused nor granted, but without any clear

24   explanation as to when the administrative processing or additional security screening will be

25   completed.  Based on this record, the court cannot find the delay in this case is not unreasonable

26   as a matter of law.  *Cf. e.g.*, *Feng*, 2014 WL 1028371, at *5 (denying summary judgment and

27   noting "[i]t remains possible that USCIS has been dragging its feet, intentionally or not.").

1         Accordingly, the court **denies** defendants' motion for summary judgment.  As noted, the

2    court **grants in part** plaintiffs' motion to strike and **denies** plaintiffs' motion to compel.

3         A Status (Pretrial Scheduling) Conference is hereby set for September 26, 2024 at 2:30

4    p.m. in Courtroom 3 (KJM) before the undersigned, with the **filing of a joint status report due**

5    **fourteen (14) days prior.**

6         This order resolves ECF Nos. 24, 37 and 42.

7         IT IS SO ORDERED.

8    DATED:  August 21, 2024.

                                           CHIEF UNITED STATES DISTRICT JUDGE